THIS OPINION IS A
PRECEDENT OF THE TTAB

Oral Hearing:  June 13, 2012          Mailed: July 2, 2013

**UNITED STATES PATENT AND TRADEMARK OFFICE**

‾‾‾‾‾

**Trademark Trial and Appeal Board**

‾‾‾‾‾

*Alcatraz Media, Inc.*

*v.*

*Chesapeake Marine Tours Inc. dba Watermark Cruises*

‾‾‾‾‾

Cancellation No. 92050879

against Registration No. 3048114

‾‾‾‾‾

E. Michelle Tyde and Rebeccah Gan of the Tyde Law Group, LLC for Alcatraz Media Inc..

H. Jay Spiegel of H. Jay Spiegel & Associates for Chesapeake Marine Tours Inc. dba Watermark Cruises.

‾‾‾‾‾

Before Seeherman, Kuhlke, and Lykos, Administrative Trademark Judges.

Opinion by Lykos, Administrative Trademark Judge:

On April 30, 2009, Alcatraz Media, Inc. ("petitioner")

filed a petition to cancel Chesapeake Marine Tours Inc. dba

Watermark Cruises's ("respondent" or "Watermark") registration

on the Principal Register for the mark ANNAPOLIS TOURS, in

standard character format, for "conducting guided tours of historic districts and other areas of cities" in International Class 41.[1]  The registration alleges March 1993 as the date of first use in commerce based upon use by respondent's predecessor in interest, Three Centuries Corporation ("Three Centuries").[2]  According to the underlying application which matured into the involved registration, the mark is used on "invoices, brochures, rack cards, business cards, advertising in publications and on a web site."[3]  Respondent disclaimed exclusive rights to the word "TOURS."  The mark is registered pursuant to Section 2(f), 15 U.S.C. § 1052(f), based solely on a declaration of at least five years of continuous and substantially exclusive use prior to making the declaration.[4]  The Section 2(f) declaration was executed by respondent's President, Ms. Debbie Gosselin, on August 18, 2005 and reads as follows:

> That the mark has become distinctive of the services
> through substantially exclusive and continuous use in

---

[1] Registration No. 3048114, registered on January 24, 2006; Section 8 affidavit acknowledged and accepted.

[2] Concurrent with the underlying application which matured into registration, respondent submitted an assignment of the mark signed by the President of Three Centuries, Paula Fishback, claiming "common law rights from the date of first use of October, 1992, and in interstate commerce since March 1993."

[3] Application Serial No. 76622508, filed November 29, 2004, p. 4.

[4] During *ex parte* examination, the examining attorney refused registration of the mark on the ground that it is geographically descriptive of the identified services under Section 2(e)(2) of the Trademark Act.  In response thereto, respondent amended the application to seek registration pursuant to Section 2(f).

commerce by Applicant and its predecessor for at least the five years immediately before the date of this statement.

As set forth in the amended petition to cancel, the grounds for cancellation are as follows: (1) respondent's registered mark is generic; (2) the mark is merely descriptive and has not acquired distinctiveness under Section 2(f); (3) the mark is primarily geographically descriptive and has not acquired distinctiveness under Section 2(f); and (4) respondent committed fraud in connection with the execution of its Section 2(f) declaration. More specifically, petitioner's claim that registrant's mark has not acquired distinctiveness is based on the following allegations:

> 29. Given that Registrant's Mark is primarily, and thus highly descriptive, as noted by the examining attorney, actual evidence that "ANNAPOLIS TOURS" is perceived as a mark for the relevant goods or services is required to establish distinctiveness.

> 30. The evidence does not establish that "ANNAPOLIS TOURS" is perceived as a mark for the relevant goods or services, i.e., conducting guided tours in Annapolis.

Petitioner's claim of fraud is based on allegations that:[5]

> 37. As of August 18, 2005, Registrant and its predecessor, Three Centuries Tours of Annapolis, had not "used" the term "Annapolis Tours" as a service "mark" in commerce "substantially exclusive and continuous for the previous five (5) years…."

---

[5] The quotation marks in the following paragraphs are part of the petition to cancel.

38.  As of August 18, 2005, Registrant knew that other companies, including Petitioner, were using the term "Annapolis Tours" in connection with tour services, and therefore knew that its use of the mark was not "substantially exclusive."

39.  Since Respondent did not conduct any search or investigation of third party use prior to selecting and adopting the mark, Respondent had no basis to declare that its use of the mark was "substantially exclusive."

40.  Since Ms. Gosselin knew she did not conduct any search or investigation of third party use prior to making her sworn declaration, Ms. Gosselin knew she had no basis to declare that its use of the mark was "substantially exclusive."

41.  At the time Ms. Gosselin made her sworn declaration, she was an officer of registrant, acting within the scope of her authority and her false declaration is attributable to Registrant by the doctrine of *respondeat superior.*

42.  Based on false averments of five years of use of Registrant's mark prior to the filing of the declaration, and five years of substantially exclusive use, Registrant committed fraud.

Respondent, in its answer to the amended petition to cancel, denied the salient allegations therein.[6]

---

[6] In addition, respondent asserted the affirmative defense of failure to state a claim upon which relief may be granted.  Insofar as respondent neither filed a formal motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6) during the interlocutory phase of this proceeding, nor argued this asserted affirmative defense in its brief, it is hereby deemed waived.  Respondent also asserted the affirmative defenses of "waiver, estoppel, acquiescence, ratification and laches" in its amended answer.  Respondent had previously asserted these identical affirmative defenses in its answer to the original complaint.  During briefing of petitioner's motion for summary judgment, respondent stated that it took no issue with the striking of these defenses and therefore the Board struck these defenses in its November 15, 2010 order.

The parties have fully briefed the case, and both were represented at an oral hearing before the Board.

## I. Claims Argued Before the Board

Insofar as petitioner has not argued the descriptive or geographically descriptive claims in its brief, we find, in accordance with the Board's usual practice, that those claims have been waived. *See, e.g., Knight Textile Corp. v. Jones Investment Co.*, 75 USPQ2d 1313, 1314 n.4 (TTAB 2005). In any event, we note that registration of respondent's involved registration under Section 2(f) constitutes a concession that its mark is not inherently distinctive. *See The Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 92 USPQ2d 1626, 1629 (Fed. Cir. 2009) ("an applicant's reliance on Section 2(f) during prosecution presumes that the mark is descriptive.") ("*Cold War Museum*").

## II. Petitioner's Motion to Strike Respondent's Brief

In Appendix 2 to respondent's trial brief, which is 16 pages in length, respondent has lodged numerous evidentiary objections. Petitioner in its reply brief argues that respondent's 16-page appendix constitutes "a subterfuge to avoid the page limit" by "cloaking whole argument sections of its brief under the guise of an appendix." Petitioner's Reply Brief, p. 7. Petitioner requests that the Board either strike respondent's trial brief in whole or in part.

Trademark Rule 2.128(b) provides that without prior leave of the Board, a party's main brief cannot exceed 55 pages. Section 801.03 of the Trademark Manual of Board Procedure ("TBMP") (3rd ed. rev.2 2013), citing the Board's decision in *Harjo v. Pro-Football Inc.*, 45 USPQ2d 1789, 1792 (TTAB 1998), sets forth, in relevant part, the following guidance in interpreting this rule:

> The parts of the brief that fall within the length limit include the table of contents, index of cases, description of the record, statement of the issues, recitation of facts, argument, and summary. … [exhibits] or appendices to a brief, not being part of the brief itself, are not included within the page limit.  In addition, evidentiary objections that may properly be raised in a party's brief on the case may instead be raised in an appendix or by way of a separate statement of objections.  The appendix or separate statement is not included within the page limit.  Nevertheless, appendices to a brief may not be used to avoid the page limitation.

*See also, Marshall Field & Co. v. Mrs. Fields Cookies*, 25 USPQ2d 1321, 1326 (TTAB 1992) ("*Marshall Field*").

We find that respondent's main brief complies with the requirements set forth above.  Appendix 2 is devoted solely to asserting and arguing respondent's evidentiary objections as opposed to any of the substantive claims before us.  In view of

the foregoing, petitioner's motion to strike respondent's brief, in whole or in part, is denied.[7]

## III. **The Record**

Pursuant to Trademark Rule 2.122, the record includes respondent's registration file and the pleadings.

In addition, the parties introduced the following:

*A.  Petitioner's Evidence*

1.  Petitioner's Notice of Reliance (filed April 14, 2011)[8] comprised of the following items:

   a. Printed publications consisting of excerpts from books and travel guides on the Mid-Atlantic region (Exs. A-G);

   b. Printed publications consisting of newspaper articles dated 1984-2007 retrieved from the Lexis/Nexis database (Ex. H);

   c. Printed publications consisting of newspaper articles dated 2002-2010 retrieved from the Lexis/Nexis database (Ex. I);

   d. Printed publications consisting of newspaper articles dated 1997-2009 retrieved from the Lexis/Nexis database (Ex. J);

   e. Printed publications consisting of printouts from Internet web sites (Ex. K);

   f. Discovery materials consisting of Respondent's Responses to Petitioner's Interrogatories and Requests for Admissions, as supplemented, dated November 12, 2009, February 4, 2010, February 25, 2010 and March 7, 2011 (Ex. L);

---

[7] In view of our determination, petitioner's response to each of respondent's evidentiary objections set forth in Appendix 1 of its reply brief has not been counted towards petitioner's page limit.

[8] Portions of the notice of reliance were designated confidential. A redacted version for public view was filed on April 15, 2011.

   g. The first discovery deposition of Debbie Gosselin, respondent's owner, dated February 2, 2010 ("Gosselin Discovery Deposition I") with Ex. 1-21 attached thereto (Ex. M); and

   h. The second discovery deposition of Ms. Gosselin dated March 29, 2011 ("Gosselin Discovery Deposition II") with Ex. 23-55 attached thereto (Exs. N and O).

2. The testimony deposition of Ryan Windsor, founder and CEO of petitioner ("Windsor Deposition"), with petitioner's Trial Exs. 72-88 attached thereto.

3. The testimony deposition of Katherine C. Summers, owner of K.C. Summers Communications, a media consulting company specializing in travel, and former travel journalist and editor for *The Washington Post* ("Summers Deposition"), identified by petitioner as its expert witness, with petitioner's Trial Exs. 23-31 attached thereto.

4. The third-party testimony depositions of the following individuals:

   a. Michael Carter, owner and operator of Annapolis Ghost Tours, formerly Ghosts of Annapolis Tours ("Carter Deposition") with petitioner's Trial Exs. 1-22 attached thereto;

   b. George Palmer, owner of Annapolis Urban Adventures, ("Palmer Deposition") with petitioner's Trial Exs. 32-34 attached thereto; and

   c. Susan Lynn Denis, former tour guide for respondent's predecessor in interest, Three Century Tours ("Denis Deposition") from 1998-2005, with petitioner's Trial Exs. 35-71 attached thereto.

5. The rebuttal testimony deposition of Ms. Denis ("Denis Rebuttal Deposition").

B. *Respondent's Evidence*

1. Respondent's Notice of Reliance (filed June 13, 2011) comprised of printouts from respondent's Internet website at annapolis-tours.com printed on June 11, 2011 (Exs. 2, 5 and 6) and printouts from third-party websites (Exs. 1, 3, and 4);

2. The testimony deposition of Debbie Gosselin ("Gosselin Testimony Deposition"); and

3. The third-party testimony depositions of the following individuals:

   a. Matthew Grubs, owner and operator of Discovery Annapolis Tours ("Grubs Deposition");

   b. Hillary Gonzales, former employee of respondent, ("Gonzales Deposition"); and

   c. Mary Jo McCulloch, President and CEO of the Maryland Tourism Council ("McCulloch Deposition").

4. Respondent's Trial Exs. 1-18 of which Exs. 7, 8, 10 and 15 were designated confidential.

## IV. **Respondent's Evidentiary Objections**

The record in this case is voluminous, and respondent has interposed numerous evidentiary objections. To the extent an objection has not been specifically addressed below, we have considered the objected-to evidence, keeping in mind the objections, and have accorded it whatever probative value it merits.

A. *Respondent's Objections to Petitioner's Trial Witnesses*

Respondent objects to the testimony of petitioner's fact witnesses, Mr. Carter, Mr. Palmer,[9] Ms. Denis, and Mr. Windsor on the grounds of hearsay, opinion testimony and bias, and moves to strike such testimony. Respondent also objects to the testimony of Ms. Denis as a rebuttal witness as opinion testimony.

The Board does not ordinarily strike testimony taken in accordance with the applicable rules on the basis of substantive objections; rather, such objections are considered by the Board in its evaluation of the probative value of the testimony at final hearing. *See Krause v. Krause Publications Inc.*, 76 USPQ2d 1904, 1907 (TTAB 2005) ("*Krause*"); *Marshall Field*, 25 USPQ2d at 1326. In accordance with our practice, we have not stricken any of the testimony offered by Mr. Carter, Mr. Palmer, Ms. Denis, and Mr. Windsor. Nonetheless, we have considered the probative value of each witness' trial testimony in light of respondent's objections. For example, we have disregarded any opinion testimony regarding the ultimate disposition of the claims asserted herein.[10] *See, e.g., Steiger Tractor, Inc. v.*

---

[9] As per the Board's March 24, 2011 interlocutory order, Mr. Palmer's testimony is not to exceed the scope of the matters stated in his affidavit.

[10] We have also disregarded any opinions on the legal claims asserted in this proceeding proffered in any of the affidavits attached as exhibits to witness testimony.

*Steiner Corp.*, 221 USPQ 165, 169 (TTAB 1984); *The Mennen Co. v. Yamanouchi Pharm. Co.*, 203 USPQ 302, 305 (TTAB 1979).[11]

We have also weighed the probative value of each witness' testimony against any potential bias, hostility or animus given that some of the witnesses are competitors of respondent. Consistent with our practice, "[w]here we have relied on testimony to which respondent objected, it should be apparent to the parties that we have deemed the material both admissible and probative to the extent indicated in the opinion." *Krause*, 76 USPQ2d at 1907.

Respondent also moves under Fed. R. Evid. 702 to strike the entirety of the testimony deposition of Katherine C. Summers as expert testimony on the ground that petitioner failed to lay the foundation necessary to establish her as a qualified expert witness regarding how the public perceives the term ANNAPOLIS TOURS.[12]  More specifically, respondent contends that Ms. Summers never conducted a survey of the relevant purchasing public,

---

[11]  *See also Jones & Laughlin Steel Corp. v. Jones Eng'g Co.*, 292 F.2d 294, 130 USPQ 99, 100 (CCPA 1961) ("The witnesses did not cite any instances of actual confusion but merely expressed an opinion as to the origin of the goods.  Such opinions are not controlling."); *The Quaker Oats Co. v. St. Joe Processing Co.*, 232 F.2d 653, 109 USPQ 390, 391 (CCPA 1956) ("[W]e deem it necessary to comment on the weight to be given the witnesses' opinions that the marks would be likely to cause confusion.  In this respect it has been held that such testimony amounts to nothing more than an expression of opinion by the witness, which obviously is not binding upon either the tribunals of the Patent Office or the courts.").
[12]  Petitioner had previously disclosed William D. Neal as an expert witness in this case but then substituted Ms. Summers as an expert witness in a supplemental disclosure.

personally visited or toured Annapolis, or interviewed tour operators in that city. In the alternative, respondent argues that she only be considered a fact witness. In response, petitioner maintains that Ms. Summers' professional experience as a travel editor and writer "has afforded her 'special knowledge' of … Mid-Atlantic tourism services." Petitioner's Reply Brief, p. 30. Petitioner further asserts that based on her interactions with tourists and residents from the Washington D.C.-Baltimore area, she is qualified to "give her views as to the manner in which the media uses the phrase 'Annapolis Tours' in newspaper articles and other publications," and as such, her testimony is probative as to petitioner's genericness claim. Petitioner's Reply Brief, pp. 30-1. Respondent also objected to some of Ms. Summers' testimony as inadmissible hearsay.

Fed. R. Evid. 702, made applicable to Board proceedings by Trademark Rule 2.116(a), provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 does not specify any particular means for qualifying an expert, requiring only that the witness possess the "knowledge, skill, experience, training, or education" necessary to "assist" the trier of fact. Fed. R. Evid. 702; Notes of Advisory Committee of Proposed Rule.[13] However, as explained in the advisory committee notes to Rule 702, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."

According to her testimony, Ms. Summers received her B.A. in journalism and political science from George Washington University in 1980. Summers Deposition, 10:1-10. She worked as an assistant editor for the travel section of *The Washington Post* for ten years. *Id*. at 12:14-13:8. She was then promoted to the position of editor where she served for eight years. *Id*. at 13:9-16. As part of her duties as travel editor, she

---

[13] In 2000, Fed. R. Evid. 702 was amended in response to the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993) ("*Daubert*"), and to the subsequent cases applying *Daubert*, including *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ("*Kumho*"). Committee Notes on Rules – 2000 Amendment. As the Supreme Court stated in *Daubert*, the trial court must determine whether the proposed expert possesses "a reliable basis in the knowledge and experience of [the relevant] discipline." *Daubert*, 509 U.S. at 592.

supervised a staff of seven to eight people as well as freelance writers, and was responsible for coming up with topics for articles, assigning stories, and editing. *Id*. at 13:15-14:9. She estimated that she has written during her thirty years as a journalist "over a thousand" articles on travel and tourism. *Id*. at 18:14-22. In addition, she ran an Internet chat/blog once a week responding in real time to emails from the public on the subject of travel. *Id*. at 14:16-15:12. Ms. Summers testified that in her professional opinion travel editors and writers have an occupational need to use the wording "Annapolis Tours" in order to accurately reference the travel and tourism industry around Annapolis. *Id*. at 53:12-20, Ex. 23. She further testified that based on her experience as a travel writer and editor, her opinion was that "the words Annapolis Tours are generic…and I think the average traveler plus the average travel journalist would see those words and think they were describing tours of Annapolis." *Id*. at 43:13–48:5. However, she also testified that she has never reviewed the legal concepts of trademark law (Summers Deposition, 56:8-12); and that in preparation for her testimony, she neither visited Annapolis nor personally interviewed other tour guide operators but instead "just Googled Annapolis Tours." *Id*. at 58:1-8. Ms. Summers further testified that she did not conduct any formal consumer surveys, studies or focus groups but rather formulated

14

her opinion of "the average American consumer of travel" from her casual conversations with people online or by telephone about visiting Annapolis, and that she did not record any data regarding these conversations (for example, the number of people she communicated with; their age, and their gender). *Id*. at 59-62.

We find that based on her professional experience as a travel writer and editor, Ms. Summers is qualified as an expert in the field of travel writing and journalism. We further find that, based on her professional experience, she is qualified as an expert as to how to convey travel information to readers and potential tourists, and how travel writers believe such information will be perceived and understood. *See UMG Recordings, Inc. v. Mattel, Inc*., 100 USPQ2d 1868, 1876-77 (TTAB 2011) (opposer's objection to witness' testimony regarding his opinion that MOTOWN is a descriptive term used to identify a musical style or genre on the grounds of lack of personal knowledge overruled; opinion is based on witness' "musicological research" and Fed. R. Evid. 703 permits an expert to give an opinion based on matters not in evidence). However, we cannot accept Ms. Summers as an expert regarding actual consumer perception. Nor can Ms. Summers' opinion serve as a substitute for the Board's judgment on the legal claims before us. Accordingly, we have treated her as an expert as explained above

and have accorded her testimony the appropriate probative value.[14]

   B. *Respondent's Objections to Petitioner's Trial Exhibits*

   Respondent moves to strike the following exhibits introduced in connection with petitioner's third-party witness testimony on the basis that respondent failed to produce the documents during discovery or supplement its discovery responses after the close thereof: Carter Deposition Exs. 2, 4, 7-10, 15-17; Denis Deposition Exs. 36, 37, 41, 52, 57, 58, 60, and 61. In response thereto, petitioner maintains that because Ms. Fishback, the owner of respondent's predecessor in interest, was incapable of testifying, petitioner had to rely on the testimony of third-party witnesses; that said third-party witnesses are not attorneys and therefore incapable of determining the relevance of documents in their possession; that the documents in question were not found until after the close of discovery; and that respondent had ample opportunity to cross-examine the witnesses.  Petitioner further asserts that "petitioner's counsel spent hours plumbing the basements of its witnesses, seeking out documents supporting or contradicting the parties' respective positions, and produced them accordingly to [r]espondent during discovery."  Petitioner's Reply Brief, n.18.

---

[14] To the extent that any of her testimony consists of hearsay, we have disregarded it.

16

In essence, respondent has moved for application of the estoppel sanction.  Under the estoppel sanction, a party that fails to provide information may, upon motion or objection by its adversary, be precluded from using that information or witness at trial, "unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  *See e.g., Panda Travel, Inc. v. Resort Option Enterprises, Inc.*, 94 USPQ2d 1789, 1792-93 (TTAB 2009) (documents not produced until after the start of trial stricken).  *See also* TBMP § 527.01(e) (3rd ed. rev.2 2013) and cases cited therein.  Parties have a duty to supplement discovery responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A).  However, requests for production of documents can only be served on a party to the proceeding. Trademark Rule 2.120(a)(3).

After considering all the relevant circumstances, we decline to apply the estoppel sanction.  In this particular case, Mr. Carter and Ms. Denis did not become available witnesses in this proceeding until after the close of discovery. Mr. Carter testified that he was reluctant to appear as a witness in this proceeding, fearing retribution as a competitor

against respondent. Carter Deposition, 65:21-66:7. Similarly, Ms. Denis was reluctant to testify until she sold her company.[15] Thus, because these witnesses are not parties to the proceeding and were initially unwilling to testify, any documents they had in their possession did not become available to petitioner until after the close of discovery. While the preferable practice would have been for petitioner to supplement its discovery responses prior to the taking of Mr. Carter's and Ms. Denis' testimony depositions, petitioner certainly cannot be said to have refused to produce the trial exhibits in question during discovery as they were not then in petitioner's possession. As such, we deny respondent's motion to strike Carter Exs. 2, 4, 7-10, 15-17; and Denis Exs. 36, 37, 41, 52, 57, 58, 60, and 61. We note, however, that even if the motion were granted and the exhibits were not considered, it would not make any difference to the ultimate result herein.

Respondent also objected to petitioner's Trial Exs. Q-ZZ which are comprised of copies from Three Centuries' internal monthly newsletter for tour guides, *The Tattler*, from the period 1995-2004. Insofar as Ms. Denis, a former tour guide for Three

---

[15] Respondent had previously moved to quash the testimony of Ms. Denis and Mr. Carter on the grounds that they were not identified as witnesses in this proceeding until pretrial and amended pretrial disclosures were served. The Board, taking into account Mr. Carter's and Ms. Denis' initial reluctance to testify in this case and the fact that respondent knew during the discovery period that petitioner was actively seeking the participation of third-party witnesses in this proceeding, denied the motion to quash. Board Order (March 24, 2011).

Centuries, properly identified and authenticated the documents during her testimony, respondent's objection is overruled.

   *C. Respondent's Objections to Petitioner's Notice of
      Reliance*

Respondent objects to the admissibility of Exs. A-G (excerpts from third-party book and travel guides on the Mid-Atlantic region, *e.g. Fodor's Virginia and Maryland*, *Landmarks of the Chesapeake Bay*) of petitioner's notice of reliance on the grounds that the documents are illegible, obscured or poorly copied. Petitioner, however, argues that respondent waived its right to object as it was not timely asserted by way of a motion to strike filed promptly after petitioner filed its notice of reliance. Petitioner maintains that because the objection is procedural in nature and it could have been cured had respondent promptly filed a motion to strike, it should be overruled.

We disagree, finding that respondent's objections raised for the first time in its main brief are in fact timely. Petitioner has a duty to ensure that the evidence it submits is legible. *Hard Rock Café Licensing Corp. v. Elsea*, 48 USPQ2d 1400, 1404 (TTAB 1998) ("It is reasonable to assume that it is opposer's responsibility to review the documents it submits as evidence to ensure that such submissions meet certain basic requirements, such as that they are legible…," finding that applicant's objections, raised for the first time in its trial

19

brief, to illegible exhibits submitted with opposer's notice of reliance, to be timely).[16]  For example, petitioner should have made sure that excerpts photocopied near the binder of the publications were readable and not obscured by thick black lines.  Nonetheless, we decline to strike the documents in their entirety because some portions thereof are legible.  That being said, the Board can only review evidence that is clear and unobstructed so we have considered this evidence to the extent it is legible and we are able to read the entire context of the evidence.

Respondent moved to strike Exs. A-G, Exs. H-J (articles obtained from the Lexis/Nexis database), Ex. K (Internet print outs from petitioner's website) and certain documents in Ex. M (Gosselin Deposition, Exs. 28, 31-34 which consist of articles obtained from the Lexis/Nexis database) on the grounds of irrelevance and immateriality.  Respondent's objections on these grounds are overruled.  These articles and Internet printouts

---

[16] The particular nature of the objection raised here is distinguishable from those types of objections which, if timely raised during trial, may be seasonably cured. *See, e.g., Corporacion Habanos SA v. Guantanamera Cigars Co.*, 102 USPQ2d 1085, 1093 (TTAB 2012)( "As for opposer's objection to the pages bearing the Internet address www.cigarcyclopedia.com...on the basis that the pages were not identified in the supplemental notice of reliance and applicant did not indicate the relevance of these documents, opposer's objection is overruled.").  *See also* TBMP §§ 532 and 707.02 (3rd ed. rev.2 2013) and cases cited therein. In the situation exemplified by the present case, the onus is on the party making the submissions to ensure that, at a minimum, all materials are clearly readable by the adverse party and the Board.

20

are competent evidence of exposure of "Annapolis Tours" to the public and the meaning the public is likely to associate with the term. *See In re Bed & Breakfast Registry*, 791 F.2d 157, 160, 229 USPQ 818, 819 (Fed. Cir. 1986) ("*Bed & Breakfast Registry*") (competent sources to show the relevant purchasing public's understanding of a term may include trade journals, newspapers and other publications). That being said, we note that such materials are only probative of what they show on their face, not for the truth of the matters contained therein.

Respondent moved to strike Exs. H-J, and certain documents in Ex. M which consist of articles obtained from the Lexis/Nexis database, on the grounds that petitioner did not testify regarding the search criteria used, petitioner did not submit all the publications obtained from the search, and the words "Annapolis" and "Tours" appear in bold or underlined form. Respondent's objections are overruled. The Board routinely accepts printouts of articles obtained from the Lexis/Nexis database, when filed under notice of reliance, so long as the date and source of each article are clear. *See Int'l Assn. of Fire Chiefs v. H. Marvin Ginn Corp.*, 225 USPQ 940, 942 n.6 (TTAB 1985), *rev'd on other grounds*, 782 F.2d 987, 228 USPQ 528 (Fed. Cir. 1986) ("*Marvin Ginn*") (excerpts from the Lexis/Nexis database were admissible through notice of reliance because the materials "clearly identify the excerpted articles by their

21

dates of publication and sources, all of which are readily available in published materials"). In addition, as part of the Board's longstanding practice, parties are permitted to submit a representative sample of relevant articles obtained from an Internet database search. *See, e.g., ProQuest Information and Learning Co. v. Island*, 83 USPQ2d 1351, 1353 (TTAB 2007) (evidence in case included a notice of reliance consisting of a representative sample of articles from printed publications available to the general public from a search conducted in the Lexis/Nexis database). A party is under no obligation, and indeed is discouraged, from making all search results of record. Only a relevant, representative sample need be submitted.[17] Lastly, the fact that the words "Annapolis" and "Tours" are underlined or in bold type does not affect the authenticity of the documents but merely shows the search criteria used.

Respondent also objected to the following documents within petitioner's Trial Ex. M: (1) Gosselin Deposition, Ex. 35 which consists of excerpts from telephone books and (2) Gosselin Deposition Exs. 15-16 which consist of GOOGLE search results printouts. Both objections are overruled. It is well established that excerpts from telephone directory pages are admissible under notice of reliance. *Manpower, Inc. v. Manpower*

---

[17] Had respondent believed that petitioner's submissions were not representative, during its testimony period respondent could have submitted other articles as rebuttal evidence.

22

*Information Inc*., 190 USPQ 18, 21 (TTAB 1976). Although Google search results are not by themselves admissible under notice of reliance, they were properly authenticated by Ms. Gosselin during her testimony. *See Calypso Technology, Inc. v. Calypso Capital Management, LP*, 100 USPQ2d 1213, 1219 (TTAB 2011) ("The *Safer* holding allowing documents printed from internet websites to be made of record by notice of reliance does not apply to [GOOGLE] search summaries, which are more in the nature of listings of documents, i.e., the website pages that the summary links to, than to the documents per se."). In general, search results obtained from GOOGLE have limited evidentiary value due to their truncated nature insofar as the search summary does not show the context in which the term or phrase is used on the listed web pages and may not include sufficient surrounding text to provide the necessary context for the use. *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 82 USPQ2d 1828, 1833 (Fed. Cir. 2007); *In re Thomas Nelson, Inc*., 97 USPQ2d 1712, 1715 (TTAB 2011); *In re Thomas*, 79 USPQ2d 1021, 1026 (TTAB 2006).

Respondent's objection to Ex. K, which consists of Internet printouts from petitioner's website showing the dates accessed and printed and URL information, on the grounds that petitioner failed to authenticate the documents by testimony is overruled. Pursuant to *Safer, Inc. v. OMS Investments, Inc*., 94 USPQ2d 1031 (TTAB 2010) ("*Safer*"), a document obtained from the Internet may

23

be admitted into evidence pursuant to a notice of reliance in the same manner as a printed publication in general circulation, in accordance with Trademark Rule 2.122(d), so long as the date the Internet documents were accessed as well as their source (the Internet address or URL) is provided and the party filing the notice of reliance indicates the general relevance of the documents.

## V.  **The Parties**

Petitioner is an online booking agent and reseller of tour and destination travel activities provided by other entities. Windsor Deposition, 9:16-10:10; Petitioner's Trial Exs. 73-74; Petitioner's Notice of Reliance, Ex. K.  In connection therewith, petitioner owns and operates over 2000 Internet web sites comprised of different domain names for different cities. Windsor Deposition at 27-28.  Petitioner commenced operating the website www.annapolistours.us in 2005 for the purpose of selling guided tours of Annapolis, MD.  *Id*. at 25:15-25:23, 25:15-27:12; Petitioner's Trial Exs. 84-86.  As petitioner testified, it chose the name for its website "as part of our business model to market and sell the tours based on the cities themselves" in order to obtain a "competitive advantage."  Windsor Deposition, 27:22-28:22; 28:24.

Respondent's predecessor in interest was Three Centuries Corporation ("Three Centuries"), a company which provided guided

tours of Annapolis. Gosselin Discovery Deposition I, 49:16-49:20; Gonzales Deposition, 40:8-13. In November 2004, Debbie Gosselin, the president and sole owner of respondent, acquired the assets by merger of Three Centuries from its owner, Paula Fishback.[18] Gosselin Discovery Deposition II, 61:13-62:9, Gosselin I Ex. 43. Prior to the merger, respondent operated under the name Watermark and engaged in the business of providing boat cruises, charters, and tours. Gosselin Discovery Deposition I, 17:20-24. During 2006-7, respondent rebranded the two merged entities as Watermark. Gosselin Discovery Deposition II, 62; Gosselin Discovery Deposition II, Ex. 43.

In 2005, petitioner and respondent entered into a business arrangement. As part of this arrangement, petitioner purchased tickets of respondent's guided tours of Annapolis and re-sold them to consumers on its website. Windsor Deposition, 31:6-34:20. Respondent testified that during the course of its business relationship with petitioner, it was unaware of petitioner's ownership and use of the website named www.annapolistours.us. Gosselin Discovery Deposition, 67:18-68:12. Respondent terminated its relationship with petitioner on February 17, 2009. Windsor Deposition, 33:7-33:22; Petitioner's Trial Ex. 88. Shortly thereafter, respondent sent

---

[18] As noted previously, Ms. Fishback was incapable of testifying in this proceeding. Gosselin Discovery Deposition II, 11:4-11:15.

petitioner a cease and desist letter, demanding that petitioner discontinue use of the term "Annapolis Tours." Windsor Deposition, 35:12-37:3. Petitioner testified that respondent never informed petitioner that it owned a registration for the mark ANNAPOLIS TOURS until after their business relationship was terminated. Windsor Deposition, 34.

## VI. **Standing**

Respondent does not dispute petitioner's standing to bring the instant cancellation proceeding. Nonetheless, plaintiff must prove its standing as a threshold matter in order to be heard on its substantive claims. *See, for example, Lipton Industries, Inc. v. Ralston Purina Co*., 670 F.2d 1024, 213 USPQ 185 (CCPA 1982). The purpose of the standing requirement is to prevent mere intermeddlers from initiating proceedings. The Federal Circuit has enunciated a liberal threshold for determining standing, namely, whether a plaintiff's belief in damage has a reasonable basis in fact and reflects a real interest in the case. *See Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999). *See also Jewelers Vigilance Committee Inc. v. Ullenberg Corp*., 853 F.2d 888, 7 USPQ2d 1628 (Fed. Cir. 1988).

Based on the record, we find that petitioner has established that it is an Internet reseller of tours and

destination activities and owns and operates a website, www.annapolistours.us, comprised in part of respondent's registered mark. See discussion *supra* "The Parties." In addition, the record reflects that the parties formerly had a business arrangement and are now competitors. *Id.* Indeed, respondent admitted that petitioner is a competitor, and sent a cease and desist letter to petitioner requesting that petitioner cease operation of its www.annapolistours.us web site and domain name. *Id.* *See also* Petitioner's Notice of Reliance, Respondent's Response to Petitioner's First Set of Interrogatories (November 12, 2009), Response No. 23. As a competitor who uses the term "Annapolis Tours" as part of its domain name, petitioner has shown that it is not a mere intermeddler, but has a real interest in this proceeding. Accordingly, petitioner has established its standing to petition to cancel respondent's registration. *See, e.g., Lipton Industries, supra*, (one basis for standing includes "descriptive use of term in registered mark"); *Stuart Spector Designs Ltd. v. Fender Musical Instruments Corp.*, 94 USPQ2d 1549, 1553 (TTAB 2009) (competitors have standing to oppose registration based on alleged genericness and lack of distinctiveness of product configuration) ("*Stuart Spector v. Fender*"). *See also Ipco Corp. v. Blessings Corp.*, 5 USPQ2d 1974, 1976-77 (TTAB 1988)

(cease and desist letter sent by applicant found sufficient to demonstrate opposer's standing).

## VII. **Genericness Claim**

First, we consider petitioner's genericness claim. It is petitioner's burden to establish that ANNAPOLIS TOURS is generic by a preponderance of the evidence. *Magic Wand Inc. v. RDB Inc.*, 940 F.2d 638, 19 USPQ2d 1551, 1554 (Fed. Cir. 1991)("Magic Wand had the burden to show by a preponderance of the evidence that the primary significance of the TOUCHLESS mark to the relevant public is the automobile washing service itself, rather than a washing service provided by a particular entity.").

A mark is treated as generic if it refers to the class or category of goods and/or services on or in connection with which it is used. *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 57 USPQ2d 1807 (Fed. Cir. 2001), *citing Marvin Ginn Corp., supra*. The test for determining whether a mark is generic is its "primary significance . . .to the relevant public." Section 14(3) of the Trademark Act (emphasis added), 15 U.S.C. § 1064(3); *In re American Fertility Society*, 188 F.3d 1341, 51 USPQ2d 1832 (Fed. Cir. 1999); *Magic Wand Inc.*, 19 USPQ2d at 1552 (Fed. Cir. 1991); and *Marvin Ginn, supra*.

To determine whether a mark is generic, we conduct a two-part factual inquiry: First, we determine the genus of the goods

28

or services at issue; second, we determine whether the term sought to be registered would be understood by the relevant public primarily to refer to that genus of goods or services. *See Marvin Ginn, supra.*

Our first task is to determine, based on the evidence of record, the genus of respondent's services. Often, the genus is defined by the identified goods or services of the involved registration, which in this case is "conducting guided tours of historic districts and other areas of cities." *See e.g.*, *In re Trek 2000 Int'l Ltd.*, 97 USPQ2d 1106, 1112 (TTAB 2010) ("the genus of goods at issue in this case is adequately defined by applicant's identification of goods…"). However, petitioner takes the position that the proper genus of services should be more narrowly defined as "guided tours of Annapolis, or simply tours of Annapolis," based on record evidence that respondent provides tours of Annapolis. Petitioner's Brief, p. 23. Respondent disagrees, arguing that the genus is adequately defined by the recitation of services. In support thereof, respondent points to its testimony that it provides tours of other regions in Anne Arundel County, Maryland as well as the city of Baltimore. Gosselin Deposition, 151:21-152:7.

We see no reason in this case to depart from the guidance provided by our primary reviewing court, the Court of Appeals for the Federal Circuit, that "a proper genericness inquiry

focuses on the description of [goods or] services set forth in the [application or] certificate of registration." *Magic Wand*, 19 USPQ2d at 1552, *citing* 15 U.S.C. § 1064(3) ("The Lanham Act permits cancellation when a "registered mark becomes the generic name for the goods or services…for which it is registered…"). Implicit in respondent's argument is the supposition that by defining the genus to include guided tours of cities other than Annapolis, MD, respondent can avoid a genericness finding. Respondent's argument essentially amounts to a matter of semantics. Respondent cannot circumvent a genericness finding on the basis that the mark ANNAPOLIS TOURS may be used to identify guided tour services of other cities. *In re Analog Devices Inc*., 6 USPQ2d 1808, 1810 (TTAB 1988) (where a mark is generic for some but not all of the goods identified in an application, registration is properly refused for all of the goods). What is crucial to our determination is that the recitation of services is sufficiently broad to encompass guided tours of "historic districts" or "other areas" of any city, including the city of Annapolis. We therefore find that the genus of services at issue in this case is adequately defined by respondent's recitation of services, specifically, "conducting guided tours of historic districts and other areas of cities."

Turning now to whether the designation ANNAPOLIS TOURS is understood by the relevant purchasing public primarily to refer

to that genus of services, our next task is to define the "relevant purchasing public." Petitioner argues that the "relevant purchasing public" in this instance consists of "anyone willing to pay money to participate in a guided tour, and includes leisure travelers who may visit Annapolis from anywhere in the world." Petitioner's Brief, p. 24. Respondent in its brief does not dispute this. The "relevant purchasing public" means "the relevant public which does or may purchase the goods or services in the marketplace." *Magic Wand*, 19 USPQ2d at 1552-3. The record shows that purchasers of respondent's services are not limited to leisure travelers visiting Annapolis but also include entities involved in the travel industry, including petitioner itself which once purchased respondent's services, for resale to consumers. *See* discussion *supra,* "The Parties." We therefore find the relevant purchasing public to include not only the leisure traveler but also travel agencies, tour providers and resellers whether they operate over the Internet or not.

According to the test set forth in the case of *In re American Fertility Society*, *supra*, and further clarified in the case of *In re Dial-A-Mattress Operating Corp*., 57 USPQ2d at 1810:

> [W]here the proposed mark is a phrase (such as "Society for Reproductive Medicine"), the Board "cannot simply cite definitions and generic uses of the constituent terms of a

mark"; it must conduct an inquiry into "the meaning of the disputed phrase as a whole." *In re The Am. Fertility Soc'y*, 188 F.3d at 1347, 51 USPQ2d at 1836.

Thus, we must now ascertain whether the designation ANNAPOLIS TOURS is understood by the relevant purchasing public as primarily referring to "conducting guided tours of historic districts and other areas of cities." Competent sources to show the relevant purchasing public's understanding of a contested term include purchaser testimony, consumer surveys, dictionary definitions, trade journals, newspapers and other publications. *In re Dial-A-Mattress Operating Corp., supra; In re Bed & Breakfast Registry*, 229 USPQ at 819; *Magic Wand*, 19 USPQ2d at 1553.

At the outset, we note that respondent's disclaimer of the individual word TOURS in its Section 2(f) registration constitutes a tacit admission that this individual term is generic for the identified services. *See In re Creative Goldsmiths of Wash., Inc.*, 229 USPQ 766, 768 (TTAB 1986) ("[W]e conclude that it is within the discretion of an Examining Attorney to require the disclaimer of an unregistrable component (such as a common descriptive, or generic, name) of a composite mark sought to be registered on the Principal Register under the provisions of Section 2(f)."). The genericness of the word TOURS is supported by the record as well, including a definition of "tour" as meaning "a long trip, as for sightseeing."

*Webster's New World College Dictionary* from www.yourdictionary.com (Petitioner's Notice of Reliance).

To support a finding that the registered mark ANNAPOLIS TOURS "as a whole" is generic, in addition to the dictionary definition of "tour," petitioner has also submitted a definition of "Annapolis" as "the capital of Maryland." *Id*. Petitioner also introduced the following: newspaper and magazine articles retrieved from the Lexis/Nexis computer database, the Internet and other sources dated from 1983-2010 which purport to show generic third-party use of the phrase "Annapolis tours" (Notice of Reliance, Ex. H, Petitioner's Trial Exs. 24-39); newspaper articles purporting to show third-party use of the phrase "Annapolis tours" as describing respondent's business or activities (Gosselin Discovery Deposition II, Ex. 31, (November 22, 2001 article from *The Washington Post* referring to Three Centuries as "an Annapolis tour group"); Gosselin Discovery Deposition II Ex. 45, (December 21, 2008 article from *The Capital* referring to respondent as an "Annapolis tour, charter and cruise company"); third-party witness testimony as evidence of the relevant public's understanding of the term (*see, e.g.*, Gonzales Deposition, 188:1-188:12, 189:5-189:8, and 215:4-215:10; Grubbs Deposition, 86:5-85:9); and the testimony of Ms. Summers and testimony from competitors (*see, e.g.*, Carter Deposition, 63:17-64:6; Palmer Deposition, 45:13-46:2). For

example, George Palmer, owner/operator of Annapolis Urban Adventures, testified that since 2010 his company website has included a hyperlink labeled "Annapolis Tours" which if clicked provides information on the tours of Annapolis his company offers. Palmer Deposition, 21:1-15. He also testified that he believed he would not be able to compete if he were barred from using the phrase "Annapolis Tours" to identify "walking tours in and around Annapolis." Palmer Deposition, 45:13-46:2. In addition, Michael Carter, owner/operator of Ghosts of Annapolis Tours, testified that he has a competitive need to use the phrase "Annapolis Tours" to identify his services. Carter Deposition, 64:2-6.

To determine if a mark is generic, we examine the evidence up through the time of trial. *See Consorzio del Prosciutto di Parma v. Parma Sausage Products, Inc*., 23 USPQ2d 1894, 1898 (TTAB 1992) ("…these language choices indicate a clear Congressional intent that a registration may be cancelled whenever the registered mark becomes generic or is abandoned or is used by the registrant to misrepresent, no matter when in the life of the registration that should occur."). With regard to the articles submitted by petitioner which purport to show third-party generic usage of the phrase "Annapolis Tours," a close examination of these articles reveals that, in many instances, the phrase appears in initial capitalization form in

34

combination with other terms to indicate the name of a particular tour, tour guide company or brand name, such as "Ghosts of Annapolis Tours" and "Discover Annapolis Tours." *See, e.g.*, Petitioner's Notice of Reliance, Ex. H (excerpt from *The Capital*, June 3, 2007, "The recent 2007 Kitchens of Annapolis Tour …); Ex. J (excerpt from *The Capital*, August 12, 2007 "Ghosts of Annapolis Tours offers a spooky alternative for families."); Ex. J (excerpt from *The Capital*, May 18, 2009 "while their older brethren rode in a trolley provided by Discover Annapolis Tours."); Ex. K (excerpt from *The Capital*, October 17, 2001, "THIRD THURSDAY, "Spirit of Annapolis Tour," Historic Annapolis Foundation, 7 PM…). Petitioner submitted no evidence of use from a printed publication of the phrase "Annapolis tours" per se as a generic designation for respondent's services. Petitioner did submit a handful of articles describing respondent as an "Annapolis tour company" or "Annapolis tour guide company." *See, e.g.,* Petitioner's Notice of Reliance, Ex. H (*The Washington Post*, September 1, 2006); Ex. J (*The Capital*, July 18, 2009); Ex. K (*The Capital*, December 21, 2008). Petitioner also submitted a few articles showing use of the phrase "Annapolis tour" to describe a tour of the city of Annapolis. *See, e.g.*, Petitioner's Notice of Reliance Ex. H (excerpt from *The Washington Post*, July 25, 1996, "The tours and programs are finding a market in people such as Anthony

35

Thompson, a Harrisburg, Pa. corrections officer who brought his church group on the Annapolis tour Saturday."); Ex. H (excerpt from *The Baltimore Sun*, August 5, 1997 "That would be after 'a taste of Baltimore' at the National Aquarium Sunday night…an optional Annapolis tour…"); Ex. H (excerpt from *The Washington Post*, April 17, 1998, "…and no Annapolis tour is complete without a stop at the academy museum…").  However, when considered in conjunction with the testimony of respondent's competitors, these uses result in at best a mixed record of use of the phrase both generically and as part of what appear to be trademarks or trade names.  This ambiguous evidence thus fails to establish that the primary significance of ANNAPOLIS TOURS to the relevant public is guided tour services of cities, rather than a guided tour service of cities provided by a particular entity.  *See In re Merrill Lynch, Pierce, Fenner, and Smith Inc.*, 4 USPQ2d 1141, 1144 (Fed. Cir. 1987) ("*Merrill* Lynch").  *See also In re America Online*, 77 USPQ2d 1618, 1623 (TTAB 2006)("the evidence of generic use is offset by applicant's evidence that shows not only a significant amount of proper trademark use but also trademark recognition" by third parties).

As we have often stated, "[g]enericness is a fact-intensive determination and the Board's conclusion must be governed by the record which is presented to it."  *In re Country Music Ass'n*, 100 USPQ2d at 1832; *In re Tennis Industry Ass'n*, 102 USPQ2d

36

1671, 1680 (TTAB 2012). After considering the totality of the record evidence and the parties' arguments, we conclude that petitioner has failed to demonstrate by a preponderance of the evidence that respondent's registered mark ANNAPOLIS TOURS "as a whole" is generic for the identified services. *See Merrill Lynch*, 4 USPQ2d at 1143 (where "recognition in a substantial number of publications that the source of the CASH MANAGEMENT ACCOUNT" was the applicant, the court found that "The mixture of usages unearthed by the NEXIS computerized retrieval service does not show, by clear evidence, that the financial community views and uses the term CASH MANAGEMENT ACCOUNT as a generic, common descriptive term for the brokerage services to which Merrill Lynch first applied the term."). Accordingly, the petition for cancellation on the ground of genericness is dismissed.

VIII.    **Section 2(f)**

As noted earlier, respondent's mark was registered under Section 2(f). Section 2(f) of the Lanham Act provides that "nothing…shall prevent the registration of a mark used by the applicant that has become distinctive of the applicant's goods [or services] in commerce." 15 U.S.C. § 1052(f). The presumption of validity that attaches to a registration issued pursuant to Section 2(f) includes a presumption that the registered mark has acquired distinctiveness. To rebut this

presumption, a party seeking to cancel such a registration must produce sufficient evidence for the Board to conclude in view of the entire record in the cancellation proceeding, that the party has rebutted the mark's presumption of acquired distinctiveness by a preponderance of the evidence. *Cold War Museum,* 92 USPQ2d at 1630. As more fully explained by the Federal Circuit in *Cold War Museum*:

> In a Section 2(f) case, the party seeking cancellation bears the initial burden to "establish a prima facie case of no acquired distinctiveness." To satisfy this initial burden, the party seeking cancellation must "present sufficient evidence or argument on which the board could reasonably conclude" that the party has overcome the record evidence of acquired distinctiveness—which includes everything submitted by the applicant during prosecution. The burden of producing additional evidence or argument in defense of registration only shifts to the registrant if and when the party seeking cancellation establishes a prima facie showing of invalidity. The Board must then decide whether the party seeking cancellation has satisfied its ultimate burden of persuasion, based on all the evidence made of record during prosecution and any additional evidence introduced in the cancellation proceeding.

*Id*. (citations omitted). We assess first the merits of petitioner's claim that respondent's mark lacked acquired distinctiveness at the time of registration or, alternatively, that it now is merely descriptive, i.e., that it lacked acquired distinctiveness at the time of trial. *See Neapco Inc. v. Dana Corp.*, 12 USPQ2d 1746, 1747 (TTAB 1989)("*Neapco*"). *See also*

*Kasco Corp. v. Southern Saw Service, Inc*., 27 USPQ2d 1501, 1506

n.7 (TTAB 1993).  As the Board stated in *Neapco*:

> In most cases, the time period of primary concern is
> the time when the registration issued.  If a
> petitioner can establish that at that time, the
> registered mark was merely descriptive, then it is
> incumbent upon the registrant to establish that prior
> to the issuance of the registration, the registered
> mark had acquired a secondary meaning in the sense
> that its primary significance was that of a source
> indicator of goods emanating from registrant.

12 USPQ2d at 1747.

Keeping this standard in mind, we will now evaluate whether

petitioner has made a prima facie case that respondent's mark

lacks acquired distinctiveness.  As noted earlier, during the

prosecution history of the application which ultimately matured

into registration for the mark ANNAPOLIS TOURS, respondent did

not submit any actual evidence of acquired distinctiveness (e.g.

advertising expenditures, volume of sales under the mark,

consumer surveys).  Instead, the USPTO found acquired

distinctiveness solely on the basis of respondent's Section 2(f)

declaration of five years of "substantially exclusive and

continuous use" immediately preceding the date of execution of

the declaration.

Petitioner argues that because the term ANNAPOLIS TOURS is

highly descriptive, a heightened showing of acquired

distinctiveness is necessary, and that respondent cannot rely

solely on its declaration of use of its mark.  Respondent

39

disputes the contention that its mark is highly descriptive, pointing to the fact that the only evidence the examining attorney required respondent to submit in support of its Section 2(f) claim was the declaration attesting to five years of substantially exclusive and continuous use. As respondent contends, "[h]ad the Examining Attorney believed the mark was highly descriptive… he would have required submission of additional indicia of acquired distinctiveness…. That he did not do so is strong evidence that the USPTO considers the mark to be of average descriptiveness, not highly descriptive…." Respondent's Brief, p. 32. Respondent then further asserts that because the examining attorney did not require actual evidence of acquired distinctiveness, petitioner must, under *Cold War Museum*, demonstrate that respondent's use was not substantially exclusive and continuous during the relevant time period in order to satisfy its initial burden of prima facie invalidity.[19]

We disagree with respondent's interpretation of *Cold War Museum*. The fact that respondent's mark was registered pursuant to Section 2(f) based solely on a declaration of use does not preclude petitioner from introducing evidence that the mark is so highly descriptive as to require actual evidence of acquired distinctiveness in order to satisfy its initial burden of proof.

---

[19] Respondent's purported lack of substantially exclusive and continuous use for the five years preceding the execution of its Section 2(f) declaration also is the basis for petitioner's fraud claim.

To hold otherwise would unduly restrict a plaintiff's ability to challenge the validity of a mark registered under Section 2(f) in a cancellation proceeding based on a declaration of use and fail to account for changes in the marketplace. Essentially, this would amount to substituting the examining attorney's determination, based on the limited record adduced during *ex parte* examination, in lieu of a more expansive record that may be shown in an *inter partes* proceeding.

The intent of *Cold War Museum* was to clarify "the various burdens at play in a cancellation proceeding" involving claims of lack of acquired distinctiveness. *Cold War Museum*, 92 USPQ2d at 1629. We do not read *Cold War Museum* as implying that where a mark is registered under Section 2(f) based solely on a declaration of use, the only recourse for a petitioner in a cancellation proceeding is to show that the use of the registered mark was not "substantially exclusive and continuous" for the five years preceding execution of the 2(f) declaration in order to establish its initial burden of prima facie invalidity.[20] Rather, a petitioner *may* carry its initial burden of showing prima facie invalidity by introducing evidence at trial that the mark is so highly descriptive that a mere declaration of five years continuous and substantially exclusive use is insufficient to establish

---

[20] We agree that evidence showing a respondent's use was not substantially exclusive, or was not continuous, could allow a petitioner to meet its initial burden of prima facie invalidity; we do not agree that this is a requirement.

acquired distinctiveness, so that actual evidence of acquired distinctiveness in the form of sales and advertising information and the like is necessary. In accordance with *Cold War Museum*, upon petitioner meeting this initial burden, the burden of proof then shifts to respondent to defend its registration.

Applying these standards, the evidence discussed above amply demonstrates that the mark, while not generic, is highly descriptive. See discussion, "Genericness Claim" *supra*. Given the highly descriptive nature of the mark and the fact that the only evidence that respondent offered at the time of registration was the five year period of use we find that petitioner has satisfied its initial burden of making a prima facie showing of lack of acquired distinctiveness. *See In re Kalmbach Publ'g Co.*, 14 USPQ2d 1490, 1494 (TTAB 1989) (finding that absent specific evidence of the extent of the mark's exposure to the purchasing public and of the purchasers' perception of the asserted mark, long use of a purported mark does not demonstrate requisite acquired distinctiveness). *See also Target Brands, Inc. v. Hughes*, 85 USPQ2d 1676, 1681 (TTAB 2007) ("Applicant's continuous use since 1992 is a fairly lengthy period, but not necessarily conclusive or persuasive on the Section 2(f) showing."). In accordance with *Cold War Museum*, the burden shifts to respondent to now prove acquired distinctiveness based on any "additional evidence or argument" produced in this cancellation proceeding, keeping in mind that

42

petitioner bears the ultimate burden of proof by a preponderance of the evidence. *See Cold War Museum*, *supra*.

Turning first to the advertising and sales figures respondent made of record in this case (Trial Ex. 3, Confidential Trial Exs. 7-8), insofar as the data was designated as confidential, we will not discuss any specific figures in this opinion. However, we can say that the numbers alone appear to be quite low. *Compare Country Music Ass'n*, 100 USPQ2d at 1834 (acquired distinctiveness found where, *inter alia*, "from 2000-2007, applicant engaged in targeted advertising campaigns, spending approximately $1-3 million annually on print and television ads, trade shows, promotional events, and email campaigns…. During that same time period, applicant earned over $92.8 million in revenues.").

Respondent points to the "substantial evidence" of unsolicited media coverage as shown by the exhibits submitted under notice of reliance. Respondent's notice of reliance, however, consists only of respondent's own promotional materials appearing on its own and others' websites (e.g., www.groupon.com and www.hiddenvacations.com), all of which were downloaded on a single date. Contrary to respondent's assertion, these materials do not constitute evidence that its registered mark has garnered unsolicited publicity in the media (i.e. from newspapers, magazines) and renown in the travel and tourism field.

In support of its claim of acquired distinctiveness, respondent also contends that it has been continuously using its registered mark since 1992. Given the highly descriptive nature of registrant's mark, continuous use alone since 1992 would not be sufficient to establish acquired distinctiveness. Aside from that, we find problematic the documentary evidence upon which respondent bases its claim of continuous use. Respondent relies heavily on its Trial Exs. 2-5 which consist of printouts from the websites referenced above purporting to show service mark usage and promotion of its mark ANNAPOLIS TOURS. Because these materials were printed from the Internet on June 11, 2011, they have no probative value in showing continuous use prior to that date, and minimal value regarding respondent's promotional efforts. In addition, respondent's Trial Ex. 7, which consists of financial reports obtained from respondent's predecessor in interest, does not show use of the phrase "Annapolis Tours" as a source indicator, and therefore has no probative value. Respondent's Trial Ex. 8 only shows revenues purportedly generated under the ANNAPOLIS TOURS mark from 2004-2009; there is no evidence regarding revenues from any prior time period and, as we have said, the revenues from 2004-2009 are, on their face, quite low.

Respondent also bases its claim of continuous use on the testimony of its witnesses, Ms. Gonzales, Ms. McCulloch, Ms.

Gosselin and Mr. Grubs, "particularly in conjunction" with respondent's documentary evidence, arguing that "those documents [Exs. 2-3] speak for themselves." Respondent's Brief, p. 33. Rare are the documents that actually speak for themselves. Moreover, as we have just explained, respondent's documentary evidence does not establish continuous use since 1992, and the testimony of its witnesses is mixed. For example, Ms. Gonzales, a former employee of respondent's predecessor in interest from 1991-2003, testified that employees were told "[w]e were Annapolis Tours" (Gonazales Deposition, 186:3-6) and that the Three Centuries website continuously displayed the ANNAPOLIS TOURS service mark until 2002. *Id*. at 37:5-38:15; 196:15-198:8). Petitioner produced contrary evidence on rebuttal, namely that respondent did not commence use of the mark ANNAPOLIS TOURS on its website until 2004. Petitioner's Trial Ex. CCC. Petitioner further produced evidence that, contrary to Ms. Gonzales' testimony, the Three Centuries' Tour Guide Manual did not instruct employees to use the mark ANNAPOLIS TOURS to identify its services and indeed was devoid of any reference to the registered mark at all. Petitioner's Trial Ex. DDD. In addition, petitioner presented testimony from Ms. Denis, a former tour guide for Three Centuries, that she never recalled identifying her former employer as "Annapolis Tours," but that rather she identified herself to the public as working for

45

"Three Centuries Tours." Denis Deposition, 28:1-14, 29, 76. She also authenticated promotional materials such as tour guide name badges, tour tickets, and tour brochures dated from 1995-2004 which used "Three Centuries," not "Annapolis Tours," to identify respondent's predecessor in interest's services. *Id.* at 17-76; Petitioner's Trial Ex. 36-58. As she testified on rebuttal, to the extent that respondent's predecessor in interest used the phrase "Annapolis Tours" on advertising materials such as rack cards, it was not as a source-identifier but rather to identify the nature of their services:

Q: Is it your testimony that Three Centuries Tours never used the wording Annapolis tours on their advertising?

A: No, I wouldn't say that. They used it but not consistently. And they used it inadvertently, you know, just – just as I did at Capital City Colonials. Just to describe what our businesses are doing, are about.

Denis Rebuttal Deposition, 11:2-9. Ms. Denis' testimony casts doubt on whether respondent's use of its asserted mark has indeed been continuous since 1992.

In further support of its claim of acquired distinctiveness, respondent asserts that petitioner copied its mark by adopting the Internet address "www.annapolistours.us" in

2005. *See* Windsor Deposition, 27:10-12. However, "[c]opying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's." *Stuart Spector Designs. v. Fender*, 94 USPQ2d at 1575, *quoting Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 36 USPQ2d 1065, 1072 (7th Cir. 1995). The record shows no evidence of intentional copying on the part of petitioner with the intent of deceiving consumers that petitioner was the source of respondent's tour guide services. Rather, we are persuaded that petitioner selected this domain name as part of its overall marketing strategy of using the name of a city combined with the word "tour" to gain a competitive advantage. *See* Windsor Deposition, 27:22-28:22; 28:24. It is generally known and not subject to reasonable dispute that adoption and use of website domain names that impart a clear indication of the products or services offered on the website is quite common, for the obvious reason that those searching the Internet will utilize such terms in searching for products or services. There is no evidence of record suggesting petitioner adopted its domain name for any other reason.

"Highly descriptive terms… are less likely to be perceived as trademarks and more likely to be useful to competing sellers than are less descriptive terms. More substantial evidence of acquired distinctiveness thus will ordinarily be required to

establish that such terms truly function as source-indicators."
*In re Greenliant Systems Ltd.*, 97 USPQ2d 1078, 1085 (TTAB 2010).
Accordingly, given the highly descriptive nature of the term
ANNAPOLIS TOURS, we find that the evidence respondent has
submitted is insufficient to rebut the prima facie case of
descriptiveness shown by petitioner, and that petitioner has met
its ultimate burden of proving, by a preponderance of evidence,
that respondent's mark is highly descriptive and has not
acquired distinctiveness.  In other words, on this record, we
cannot find that the relevant public associates the designation
ANNAPOLIS TOURS with respondent alone, or recognizes the
designation as a mark identifying only respondent's identified
services.  In view of our findings, the petition for
cancellation is granted on the ground that respondent's mark is
merely descriptive and has not acquired distinctiveness.

IX.  **Fraud**

Although we have determined that respondent's registered
mark lacks acquired distinctiveness, in order to render a
complete decision, we will also address petitioner's fraud
claim.

Fraud in procuring a trademark registration or renewal
occurs only when an applicant or registrant knowingly makes a
false, material representation with the intent to deceive the
PTO.  *In re Bose Corp.*, 580 F.3d 1240, 91 USPQ2d 1938, 1941

(Fed. Cir. 2009) ("*Bose*").  A party seeking cancellation of a trademark registration for fraudulent procurement bears a heavy burden of proof.  *Id.*, *citing W.D. Byron & Sons, Inc. v. Stein Bros. Mfg. Co.*, 377 F.2d 1001, 153 USPQ 749, 750 (CCPA 1967).  Indeed, "the very nature of the charge of fraud requires that it be proven 'to the hilt' with clear and convincing evidence.  There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party."  *Id.*, at 1939, *quoting Smith Int'l, Inc. v. Olin Corp.*, 209 USPQ 1033, 1044 (TTAB 1981).  As emphasized in *Bose*:

> Subjective intent to deceive, however difficult it may be to prove, is an indispensable element in the analysis.  Of course, "because direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence.  But such evidence must still be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement."  *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 [88 USPQ2d 1001] (Fed. Cir. 2008).

*Id.* at 1941.

Petitioner's claim of fraud in the petition for cancellation is based on respondent's purportedly false averments in the Section 2(f) declaration that the mark ANNAPOLIS TOURS had acquired distinctiveness through "substantially exclusive and continuous use in commerce by [respondent] and its predecessor for at least the five years immediately before the date of this statement."  As noted above,

49

the declaration was executed on August 18, 2005, making the relevant time period the five years preceding that date. Petitioner argues that respondent's president, Ms. Gosselin, took no action prior to signing the declaration (other than confirming ownership of the Maryland state trade name) to verify whether its predecessor in interest, Three Centuries, had made substantial and continuous use of the mark. Petitioner further maintains that Ms. Gosselin knew that Three Centuries was not using "Annapolis Tours" as a source identifier when she executed her declaration. In support thereof, petitioner points to the fact that respondent publicly referred to the acquisition as the "merger" of "Three Centuries Tours of Annapolis and Watermark Cruises." Petitioner's Brief, p. 38; Petitioner's Trial Ex. CCC. In addition, petitioner contends that Ms. Gosselin was aware of third-party usage of the phrase "Annapolis Tours" by respondent's competitors such as Discovery Annapolis Tours and Ghost of Annapolis Tours/Annapolis Ghost Tours at the time respondent executed its Section 2(f) declaration (Grubbs Deposition, 93), as well as the Annapolis & Anne Arundel County Conference & Visitor's Bureau ownership and use of the domain name www.annapolistours.com until 2005(Gosselin Testimony Deposition, 40-1; Gosselin Discovery Deposition II, 10). Petitioner argues that "the requisite intent to deceive the PTO can be inferred" from Ms. Gosselin's conduct in this proceeding,

50

including that she alone searched for and reviewed documents responsive to petitioner's document production requests without consulting with her attorney regarding relevancy, and that "at a minimum, Ms. Gosselin's execution of the 2(f) Declaration evidences a reckless disregard for the truth and intent to seek a registration for which she knew she was not entitled." Petitioner's Brief, p. 40.

Respondent, without further elaboration in its brief, contends that Ms. Gosselin's testimony demonstrates that she lacked the requisite intent to deceive the USPTO (Gosselin Testimony Deposition, 59:2-66:5), and further maintains that Ms. Gosselin's consultation with legal counsel prior to signing and executing the Section 2(f) declaration mitigates against a finding of fraud in accordance with the Board's recent decision in *M.C.I. Foods, Inc. v. Bunte,* 96 USPQ2d 1544 (TTAB 2010) ("*M.C.I. Foods*"). Respondent's Brief, p. 35.

Before discussing the relevant testimony, we wish to make clear that respondent oversimplifies the Board's ruling in *M.C.I. Foods*. In that case, the Board found that while applicant's overly expansive identification of goods was false, applicant did not intend to deceive the USPTO based on testimony that applicant discussed with legal counsel how to list the identification of goods prior to filing its application. However, as the Board then emphasized:

> We add that our finding here does not mean that mere assertion that one acted on "advice of counsel" will make out a good defense to a charge of fraud. Rather, our finding should be taken as an indication that the charging party must be able to show at trial that the defense is inapplicable or inappropriate under the particular circumstances of the case at hand.

*Id*. at 1550. In other words, respondent cannot simply avoid a finding of fraud by merely asserting that it relied on the advice of counsel in executing the Section 2(f) declaration. That being said, where a defendant has adduced evidence of its reliance on advice of counsel, it is incumbent upon the charging party "to establish such a factual basis [for the inapplicability of the defense] by, for example, eliciting further testimony as to the actual advice … received and whether or to what extent" the advice was relied upon. *Id*. at 1449.

With this in mind, we will now examine Ms. Gosselin's testimony regarding her reliance on counsel in executing the Section 2(f) declaration. "…[A]bsent the requisite intent to mislead the PTO, even a material misrepresentation would not qualify as fraud under the Lanham Act warranting cancellation." *Bose*, 91 USPQ2d at 1940, *citing King Auto., Inc. v. Speedy Muffler King, Inc.*, 667 F.2d 1008, 1011 n.4, 212 USPQ 801 (CCPA 1981). Thus, we will further focus our analysis on Ms. Gosselin's intent, as may be shown by her testimony.

Ms. Gosselin testified that she consulted with her attorney prior to executing the Section 2(f) declaration, and that at the

time she signed the declaration, she believed that the statements contained therein were true:

Q:  Now, when the time came for you to consider signing this declaration did you consult with anybody to determine whether or not you should sign it?

A:  I consulted with my attorney.

…

Q:  I do not want you to testify as to what the consultation was because that would be within the attorney/client privilege, but I want to ask you what you decided to do as a result of that consultation?

A:  I signed it, I signed the declaration.

Q:  So is it a correct statement that you signed this declaration on advice of counsel?

A:  Yes, it is.

Q:  And when you signed it did you believe it to be true?

A:  Yes I did.

Q:  And let me be more specific.  Did you believe it to be true that the mark Annapolis Tours, the service mark Annapolis Tours, had been in substantially continuous use in commerce for at least the five years immediately before the date of the signature on this declaration?

A:   Yes.

Q:   And in saying yes do you understand that the date of the signature is August 18, 2005 so what we are talking about is the period from August 18, 2000 to August 18, 2005?

A:   That is correct.

Q: How did you know that it had been so continuously used, substantially continuously used?

A:   Personal observation of the use of the mark, conversation with the predecessor, the predecessor's own declaration, and I think that's it.

Gosselin Testimony Deposition, 61-62:17.

Counsel for respondent elicited further testimony from Ms. Gosselin about the specific nature of her personal observations which formed the basis for her belief that the statements in the Section 2(f) declaration were indeed true and accurate:

Q: … [D]id you do any due diligence to assess how [Watermark, respondent's predecessor] were using the mark Annapolis Tours?

A:   I did some due diligence, I did due diligence and I did some in that regard.

Q:   What did you do?

…

A:  I looked at the advertisements and I looked at the rack cards and the receipts.  I looked at the materials that they were using the mark on.

…

Q:  So you looked at the rack cards and the brochures for the five preceding years?

A:  And talked with Paula about that.

Gosselin Testimony Deposition, 119-120:1.

…

Q:  What did you personally observe?

A:  I personally observed that Paula used Annapolis Tours. And I when I had done business in Annapolis in the hospitality industry and got to know other members and saw other company names and advertising when looking for mine, I did not ever observe any other use of the Annapolis Tours as a mark for our services.

Gosselin Testimony Deposition, 126:5-12.   Ms. Gosselin was then asked the following questions:

Q:  Do you recall if Paula Fishback as part of the sale of the assets ever represented in writing other than the assignment about the usage of Annapolis Tours as a brand or as a mark?

A:  Did she ever represent in writing other than the assignment?

Q:  Did she represent and warrant that they were using it exclusively and continuously at any point –

A.  Other than here.

Q:  Other than here?

A:  No I'm not aware of any other written instrument.

Gosselin Testimony Deposition, 124:21-125:8.  Ms. Gosselin went on to testify, however, that she did not know whether she had checked Watermark's web site for proper service mark use of ANNAPOLIS TOURS prior to the purchase of assets.  Gosselin Testimony Deposition, 191-192.

Based on this record, we find that petitioner has failed to prove "'to the hilt' with clear and convincing evidence" (*Bose*, 91 USPQ2d at 1939 (citations omitted)) that respondent fraudulently obtained its registration.  "…[T]he involved conduct, viewed in light of all the evidence… must indicate sufficient culpability to require a finding of intent to deceive."  *Id*. at 1245.  Even if respondent's statements in the Section 2(f) declaration were false, Ms. Gosselin's testimony demonstrates that the statements were not made with the requisite intent to deceive the USPTO.

As noted above, she testified that she "believed" that the statements regarding continuous use contained in the Section 2(f) declaration were true based on her personal observations of use of the mark ANNAPOLIS TOURS on rack cards and brochures, and

that she did not merely rely on the advice of counsel to sign the declaration but undertook "some due diligence" to verify that the statements were true.  Indeed, "[t]here is no fraud if a false misrepresentation is occasioned by an honest misunderstanding or inadvertence without a willful intent to deceive." *Id*. at 1942 (internal citation omitted).

With regard to petitioner's argument that Ms. Gosselin acted with "reckless disregard," the Federal Circuit in *Bose* left unanswered the question whether recklessness would satisfy the intent to deceive requirement because there was no basis for finding in that particular case that the applicant's conduct was reckless.  *Id*. at 1942, n.2.  Ms. Gosselin's testimony shows that she personally observed the use of the mark, and that she had conversations with Ms. Fishback about the use of the mark. Further, respondent submitted an assignment of the mark.  As a result, we find that Ms. Gosselin did not act with recklessness, and therefore, we need not reach that unresolved question.

In addition, with regard to the statements in the Section 2(f) declaration attesting to "substantially exclusive" use, Ms. Gosselin testified that although she was aware of third-party use of the marks DISCOVERY ANNAPOLIS TOURS and GHOST TOURS OF ANNAPOLIS during the five-year period referenced in the Section 2(f) declaration, she did not believe that such use meant that respondent's use of the term ANNAPOLIS TOURS alone was non-

57

exclusive.  Thus, based on the record evidence, we find that Ms. Gosselin did not have the requisite intent to commit fraud when she executed the Section 2(f) declaration.  Accordingly, the petition for cancellation on the ground of fraud is dismissed.

**DECISION**:  The petition for cancellation on the grounds of genericness and fraud is dismissed; however, it is granted on the ground that the mark lacks acquired distinctiveness under Section 2(f).  The registration will be cancelled in due course.